IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
Case No. 2:26-cv-10911

| | |
|---|---|
| **SIDEWALK ADVOCATES FOR LIFE** and **KEVIN HAMMER**,  )<br><br>Plaintiffs,  )<br><br>v.  )<br><br>**CITY OF DETROIT**, a Michigan municipal corporation,  )<br><br>Defendant.  )<br>_____ ) | U.S. District Judge: TBD<br><br>U.S. Magistrate Judge: TBD<br><br>**COMPLAINT**<br>[Violation of Civil Rights under 42 U.S.C. § 1983; Violation of the Michigan Constitution; Declaratory and Injunctive Relief] |

THOMAS MORE SOCIETY
B. Tyler Brooks (P82567)
309 W. Washington Street
Suite 1250
Chicago, Illinois 60606
(312) 782-1680
tbrooks@thomasmoresociety.org

*Counsel for Plaintiffs*

Plaintiffs Sidewalk Advocates for Life and Kevin Hammer (collectively, "Plaintiffs"), by and through counsel, allege for their complaint against Defendant City of Detroit, as follows:

## INTRODUCTION

1.      This is a civil rights action under 42 U.S.C. § 1983 challenging the City of Detroit's Ordinance No. 2024-45 (hereinafter, "the Ordinance"), codified at Detroit City Code Chapter 31, Article XIV, §§ 31-14-1 through 31-14-4, which creates a fifteen-foot fixed buffer zone around (hereinafter, "the buffer zone") every entrance to any healthcare facility in the City of Detroit (hereinafter, "the City"), and an eight-foot floating bubble zone around every patient and companion within a one hundred-foot radius of such entrance (hereinafter, "the bubble zone"). The Ordinance, which is enforceable through criminal penalties, violates the Free Speech, Free Exercise, and Freedom of Assembly Clauses of the First Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as well as the Michigan Constitution.

2.      The Ordinance is substantively identical to the Pittsburgh, Pennsylvania, ordinance struck down by the United States Court of Appeals for the Third Circuit in *Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009)—the same fifteen-foot fixed buffer, the same eight-foot floating bubble, the same combination of overlapping speech-restrictive

zones. This configuration has been held unconstitutional because the combination of a fixed buffer zone *and* a floating bubble zone burdens substantially more speech than necessary to serve any legitimate governmental interest. While either zone alone presents a closer question as to passing constitutional muster, layering one atop the other does not.

3.      Plaintiffs are peaceful sidewalk advocates who offer loving, life-affirming alternatives to women approaching the Scotsdale Women's Center in Detroit, Michigan. Their speech is quiet, prayerful, and non-confrontational. Plaintiff Kevin Hammer stands on the public sidewalk along West 7 Mile Road, a quintessential public forum, holding a sign that reads "Ask Me About Free Ultrasounds and Pregnancy Tests" and offering a gentle verbal message and life-affirming literature to women who pass by. Plaintiff Sidewalk Advocates for Life ("SAFL") trains, equips, and supports Mr. Hammer and hundreds of other certified advocates nationwide in "peaceful, prayerful, loving, and law-abiding sidewalk outreach." The Ordinance criminalizes this constitutionally protected expression by creating overlapping exclusion zones that push Plaintiffs beyond conversational distance and prevent the human, personal interactions that are the essence of their ministry.

3

4. The City's stated justification of protecting patient access does not require two overlapping speech-restrictive zones and likely requires neither. The City never attempted less restrictive alternatives, such as targeted enforcement of Michigan's existing harassment and obstruction laws, before resorting to a blanket prohibition on the core First Amendment activity of approaching a fellow citizen on a public sidewalk. Instead, the City enacted the Ordinance on the basis of testimony overwhelmingly directed at silencing pro-life sidewalk counselors, and it did so with the direct involvement of the local abortion clinic's director in the drafting process. *See* Ex. A (Ordinance No. 2024-45, full text).

5. Plaintiffs seek a declaration that the Ordinance is unconstitutional on its face and as applied to their protected expression, preliminary and permanent injunctions against its enforcement, nominal damages, and an award of reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and as otherwise allowed by law.

## JURISDICTION AND VENUE

6. This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988, as well as the Michigan Constitution.

4

7.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1367 (supplemental jurisdiction), and 28 U.S.C. § 1343(a)(3) and (4) (civil rights jurisdiction).

8.     This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202, Federal Rule of Civil Procedure 57, and Michigan law.

9.     This Court has authority to grant injunctive relief under Federal Rule of Civil Procedure 65.

10.    Venue is proper in this District under 28 U.S.C. § 1391(b) because the Defendant City of Detroit is a municipal corporation located in this District and the events giving rise to the claims occurred in Wayne County, Michigan, within this Division.

## PARTIES

### A. Plaintiff Sidewalk Advocates for Life

11.    Sidewalk Advocates for Life ("SAFL") is a Texas nonprofit corporation headquartered in Allen, Texas. SAFL was founded in 2014 by attorney Lauren Muzyka. SAFL's mission is "to train, equip, and support communities across the United States and the world in sidewalk advocacy: to be the hands and feet of Christ, offering loving, life-affirming

5

alternatives to all present at abortion and abortion-referral facilities, thereby eliminating demand and ending abortion." SAFL operates active sidewalk advocacy programs at over 230 facility locations across the country, covering over 30 percent of abortion sites in the United States, and reports over 24,000 confirmed cases of women who chose life-affirming alternatives after engaging with SAFL's certified Sidewalk Advocates.

12. SAFL has standing to bring claims on its own behalf and on behalf of its members, including its certified Sidewalk Advocates and local Program Leaders, under the principles of organizational and associational standing. Specifically, (a) SAFL's members, including Kevin Hammer and other certified advocates participating in its Detroit-area program, would otherwise have standing to sue in their own right; (b) the interests SAFL seeks to protect (*viz.*, the right to engage in peaceful sidewalk counseling on public sidewalks) are germane to SAFL's organizational purpose; and (c) neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit. *See, e.g., Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977).

13. SAFL expends substantial organizational resources—including full-time staff support, comprehensive training materials (a ten-module, approximately five-hour certification program), volunteer coordination, and ongoing program administration—on its sidewalk advocacy programs nationwide, including its active programs in the Detroit metropolitan area at facilities in Westland and Redford. SAFL's local operations are led by Program Leaders like Kevin Hammer, who typically recruit, train, and schedule certified Sidewalk Advocates, all of whom must sign a Pledge of Integrity and are guided by the SAFL Statement of Faith. The Ordinance has forced SAFL to divert resources from its core mission of training and equipping sidewalk advocates to address the legal and operational consequences of the Ordinance's restrictions, including the development of altered training protocols to address criminal liability exposure, reduced program availability in the Detroit area, and the expenditure of staff time advising local leaders and advocates about compliance with the Ordinance's overlapping zone requirements.

### B. Plaintiff Kevin Hammer

14.    Kevin Hammer is an individual residing in Michigan and a certified Sidewalk Advocate with SAFL. Mr. Hammer is a retired attorney. Since approximately September 2025, Mr. Hammer has engaged in peaceful sidewalk counseling on the public sidewalk outside the Scotsdale Women's Center located at 19305 West 7 Mile Road, Detroit, Michigan 48219, primarily on Fridays, for approximately one and one-half hours per session. He offers individuals approaching the clinic information about free ultrasounds, pregnancy tests, and alternatives to abortion, and he holds a sign approximately two feet by four feet reading "Ask Me About Free Ultrasounds and Pregnancy Tests." He does not follow, chase, block, or yell at anyone. He does not engage in aggressive or confrontational behavior; to do so would be antithetical to his personal beliefs, his SAFL training, and the purpose and effectiveness of his sidewalk ministry.

15.    Mr. Hammer has an intention, which he would carry out but for the Ordinance, to continue and expand his sidewalk counseling activities at the Scotsdale Women's Center. He has never been cited, formally warned, or arrested. He nonetheless faces an objectively

8

reasonable fear of prosecution under the Ordinance because (a) violation of the Ordinance may result in criminal and/or civil penalties for its violation, including fines and imprisonment; (b) the clinic has called City police to the site on more than one occasion specifically because of his counseling activities; (c) City police have responded to the site and investigated his activities on at least two occasions, including one occasion on which five patrol cars and senior officers responded; and (d) the Ordinance is actively in effect and has not been judicially enjoined.

16.   The Ordinance chills Mr. Hammer's protected expression in specific and concrete ways. The buffer zone effectively prevents him from accessing the public sidewalk east of the clinic entrance, where patients park on the street when the clinic's parking lot is full, thereby cutting off his ability to reach a significant portion of arriving women before they enter the clinic. The bubble zone effectively prevents him from closing the distance necessary for one-on-one, personal communication on West 7 Mile Road, a major four-lane arterial road with heavy vehicle and bus traffic that generates substantial ambient noise. Without the Ordinance, Mr. Hammer would approach individuals more closely when he observes willingness in their expressions and when traffic noise makes

communication at eight feet virtually impossible. The Ordinance thus forces Mr. Hammer to choose between abandoning his constitutionally protected ministry and risking criminal prosecution, creating the "classic dilemma" that establishes First Amendment standing.

### C. Defendant City of Detroit

17.    The City of Detroit (hereinafter, "the City") is a municipal corporation organized and existing under the laws of the State of Michigan. The City is a "person" within the meaning of 42 U.S.C. § 1983 and acted under color of state law in enacting and enforcing the Ordinance. The Ordinance is the official policy and practice of the City of Detroit within the meaning of *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The City and its Ordinance No. 2024-45 are the moving force behind the deprivations of Plaintiffs' constitutional rights described herein. The City has approved of and ratified the acts, policies, practices, customs, and procedures of its personnel that deprived and are depriving Plaintiffs of their fundamental constitutional rights as set forth in this Complaint. The City enjoys no lawful immunity on these claims.

## PLAINTIFFS' FIRST AMENDMENT-PROTECTED ADVOCACY

### A. SAFL's Sidewalk Advocacy Program

18.    SAFL trains and equips local teams of certified Sidewalk Advocates at abortion facilities nationwide. It operates active programs at over 240 facility locations, covering approximately 35 percent of abortion sites in the United States. SAFL's program involves comprehensive training consisting of ten modules and approximately five hours of instruction. All certified advocates must sign a Pledge of Integrity and adhere to a Statement of Faith. Local operations are led by Program Leaders who recruit, train, and schedule volunteers.

19.    SAFL describes its approach as "peaceful, prayerful, loving, and law-abiding sidewalk outreach." All certified advocates are trained to engage in compassionate, non-confrontational conversation, offering women information about alternatives to abortion including free ultrasounds, pregnancy tests, and material assistance. SAFL's published training materials emphasize that advocates must not block, obstruct, yell, or engage in any aggressive behavior.

20.    Through its sidewalk advocacy program, SAFL reports over 24,000 confirmed cases of women who chose life-affirming alternatives

11

after engaging with SAFL's sidewalk counselors. SAFL has also documented dozens of former abortion workers who left the industry after interactions with SAFL advocates and 71 abortion facilities that have closed in communities where SAFL operates.

21.   SAFL operates active sidewalk advocacy programs in the Detroit metropolitan area, including at nearby facilities in Westland, Michigan, and Redford, Michigan. Kevin Hammer is a SAFL-trained Sidewalk Advocate who serves as the local organizer and primary Sidewalk Advocate for SAFL's effort at the Scotsdale Women's Center (hereinafter, the "Clinic") in Detroit.

## B. Kevin Hammer's Sidewalk Ministry

22.   Mr. Hammer is motivated by his sincere religious beliefs to offer loving alternatives to those considering abortion. His sidewalk counseling is an exercise of both his right to free speech and his right to free exercise of religion. He counsels because he believes every human life has inherent dignity and that women deserve to know about the alternatives and support available to them.

23.   Mr. Hammer stations himself on the public sidewalk west of the Clinic entrance, approximately 20 to 25 feet from the Clinic door. He

12

holds a sign approximately two feet by four feet reading "Ask Me About Free Ultrasounds and Pregnancy Tests." He stands or paces slowly to avoid obstructing pedestrian traffic. When a woman approaches, he currently offers a quiet verbal message to this effect: "If you'd like to consider any alternatives today, I'm here to help you." He extends literature as a visual cue. He does not follow, chase, block, or yell at anyone.

24. Effective sidewalk counseling requires conversational proximity. Mr. Hammer must be close enough to speak in a normal, compassionate tone (not shout) so that a woman can hear him over the ambient traffic noise of West 7 Mile Road, a major four-lane arterial road with heavy vehicle and bus traffic. Mr. Hammer frequently cannot tell whether women even hear him because of road noise. The ability to close distance when a woman shows willingness to engage is essential to the gentle, personal interaction that defines effective sidewalk counseling.

25. In approximately six months of regular sidewalk counseling at the Scotsdale Women's Center, Mr. Hammer has never been cited, formally warned, or arrested. City police officers who have responded to calls from the Clinic have confirmed on each occasion that Mr. Hammer

13

is within his rights and have departed without taking enforcement action.

26.     In the initial weeks of his counseling (September to October 2025), nearly every woman who entered the Clinic looked at Mr. Hammer, and many approached voluntarily. Within several weeks, behavior shifted. Most women now walk directly past without making eye contact, displaying what Mr. Hammer describes as "tunnel vision." On one occasion, when Mr. Hammer visited on an unexpected day (a Tuesday, rather than his usual Friday), nearly every woman stopped and engaged, suggesting that the Clinic warns patients about his presence in advance. This demonstrates the critical importance of east-side access, which is now blocked by the buffer zone, to reach women before they have been pre-conditioned to avoid him.

27.     On two occasions in approximately October 2025, Detroit police responded to calls from the Clinic regarding Mr. Hammer's presence. In the first response, two City officers from one patrol car arrived, consulted with a clinic employee Plaintiffs believe is named "Jay," and then spoke with Mr. Hammer. Mr. Hammer asserted his right to be on the public sidewalk, and the officers confirmed to Jay that Mr.

14

Hammer was within his rights. Later the same day, five patrol cars arrived with supervisory officers. Mr. Hammer recited the Ordinance's provisions verbatim—the 15-foot buffer, the 8-foot bubble, the 100-foot radius—and the lead officer confirmed his compliance to Jay. All officers departed without taking enforcement action.

## THE CHALLENGED ORDINANCE

28.    On October 1, 2024, the Detroit City Council passed Ordinance No. 2024-45 by a vote of 7 to 1. The Ordinance was approved by the Mayor on October 10, 2024, and became effective upon publication on October 22, 2024. The Ordinance adds Article XIV ("Offenses at Healthcare Facilities") to Chapter 31 ("Offenses") of the 2019 Detroit City Code, consisting of Sections 31-14-1 through 31-14-4. A true and correct copy of the Ordinance is attached hereto as Exhibit A.

29.    The Ordinance's purpose section declares that the City seeks to balance "the exercise of a person's right to protest or counsel for or against certain medical procedures" against "another person's right to obtain medical counseling and treatment in an unobstructed manner." *See* Ex. A at § 31-14-1. The stated purpose is itself content-referencing on its face: the City expressly invokes the purpose of the regulated speech

15

("protest or counsel for or against certain medical procedures") as the predicate for the regulation.

30.    The Ordinance defines "healthcare facility" broadly to include any "a hospital, or medical clinic or office, or any combination of the two[.]" *See* Ex. A at § 31-14-2. It similarly defines "medical clinic or office" broadly: "*Medical clinic* or *office* means an establishment providing therapeutic, preventative, corrective, healing, and health-building treatment services on an out-patient basis by physicians, dentists, and other practitioners." *Id.* These definitions encompass virtually every hospital, medical clinic, dentist's office, and doctor's office in the City of Detroit, not only abortion clinics.

31.    Section 31-14-3 creates the bubble zone. It provides that no person shall "knowingly approach within eight feet of another person, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person in the public right-of-way unless such other person consents" within 100 feet of any entrance to a healthcare facility. *See* Ex. A at § 31-14-3.

32.    Section 31-14-3 is content based on its face. Enforcement requires examining whether the speaker's purpose is "protest, education

16

or counseling." This is a determination that cannot be made without reference to the content of the speech. A person who approaches another within eight feet to ask for directions, request a charitable donation, or make small talk faces no restriction under the Ordinance; only a person whose speech constitutes "protest, education or counseling" is subject to criminal and civil liability. Under *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), a law that defines regulated speech by its function or purpose is content-based and presumptively unconstitutional.

33.   Section 31-14-4(a) creates the buffer zone. It provides that no person shall "knowingly congregate, patrol, picket or demonstrate within a 15-foot radius of any entrance to [a] healthcare facility." *See* Ex. A at § 31-14-4(a). This is a fixed exclusion zone that prohibits all expressive activity, including passive sign-holding, silent prayer, and quiet conversation, within 15 feet of any entrance.

34.   Section 31-14-4(b) exempts from the buffer zone (1) police, fire, rescue, and emergency workers; and (2) "[a]uthorized security, personnel, employees, or agents" of the healthcare facility "engaged in assisting patients and other persons to enter or exit" the facility. *See* Ex. A at § 31-14-4(b)(1)-(2). The employee exemption permits clinic personnel

17

to engage in the precise conduct the Ordinance forbids for everyone else—namely, standing within 15 feet of the entrance, approaching patients, and walking alongside them into the facility.

35. The Ordinance thus layers two independent speech-restrictive mechanisms at the same facility entrances: a fixed 15-foot zone where no one may "congregate, patrol, picket or demonstrate," *and* a floating 8-foot zone extending to 100 feet where no one may approach another person for speech purposes without consent. This combination is substantively identical to the Pittsburgh ordinance invalidated in *Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009).

36. Violations of the Ordinance are punishable as misdemeanors under Chapter 31 of the Detroit City Code and may also result in civil penalties. The Ordinance itself contains no severability clause.

## FACTUAL ALLEGATIONS

### A. The Public Sidewalk as a Quintessential Public Forum

37. The public sidewalks of the City of Detroit, including the sidewalk along West 7 Mile Road in front of the Scotsdale Women's Center, are quintessential traditional public forums. "Places which by long tradition or by government fiat have been devoted to assembly and

18

debate" occupy a special position in terms of First Amendment protection. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Public sidewalks have "immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515 (1939). The government's ability to restrict speech in such forums is at its most limited. *McCullen v. Coakley*, 573 U.S. 464, 476-77 (2014).

38.     Mr. Hammer conducts all of his counseling activities from the public sidewalk. He does not enter the clinic's private property. The speech in which Plaintiffs engage—quiet conversation, the offering of literature, the display of a sign, and silent prayer—is the type of personal, one-on-one communication that is the hallmark of the First Amendment's protection.

### B. The Scotsdale Women's Center and Surrounding Site

39.     The Scotsdale Women's Center (the "Clinic") is an abortion clinic and family planning center located at 19305 West 7 Mile Road, Detroit, Michigan 48219. It has operated since approximately 1978. It provides surgical abortions up to 15 weeks and 6 days, medication

19

abortions up to 11 weeks, and medication abortion by mail. The Clinic self-describes itself as "the leading independent abortion clinic in Metro Detroit." The Clinic's executive director, Shelly Miller, is a self-described "long-time abortion rights activist," who played a central role in advocating for the Ordinance, as described below.

40. The Clinic sits on the south side of West 7 Mile Road. The Clinic entrance (front door) is approximately two feet from the public sidewalk that runs east–west along 7 Mile Road. The parking lot is located west of the Clinic entrance. When the parking lot is full, patients and employees park on the street to the east of the Clinic and approach the entrance from that direction. They also approach from that direction when patients are being dropped off.

41. The public sidewalk runs east to west in front of the Clinic. The Clinic entrance is adjacent to the sidewalk.

42. Because the Clinic entrance is only approximately two feet from the public sidewalk, the 15-foot buffer zone consumes the entirety of the usable sidewalk space in front of the Clinic entrance and extends well into the public right-of-way. A person within this zone on a public sidewalk (other than those excluded by the Ordinance itself) is prohibited

from congregating, patrolling, picketing, or demonstrating. *See* Ex. A at § 31-14-4(a).

43.    The 100-foot radius encompasses a large swath of the public sidewalk in both directions along 7 Mile Road, including Mr. Hammer's typical counseling position approximately 20 to 25 feet from the door. Within this zone, no person may "knowingly approach within eight feet of another person for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling" without that person's consent. *See* Ex. A at § 31-14-3.

44.    West 7 Mile Road is a major four-lane east-west arterial road in Detroit. It carries heavy commercial and residential vehicle traffic, with bus service along its route. The ambient noise from traffic on 7 Mile Road is substantial. Mr. Hammer often cannot tell whether women approaching the Clinic even hear him because of road noise. Normal-volume conversation, which is the kind of quiet, compassionate, one-on-one interaction that defines effective sidewalk counseling, is difficult or impossible at a distance of eight feet or more from a passerby on this road.

### C. Legislative History and Evidence of Content and Viewpoint Targeting

45.     The Ordinance was introduced by Council Member Gabriela Santiago-Romero. According to media reports, Council Member Santiago-Romero introduced the Ordinance "after collecting stories of healthcare providers and patients being verbally harassed by anti-abortion demonstrators." The Ordinance was passed by the Detroit City Council on October 1, 2024, by a vote of 7 to 1, approved by the Mayor on October 10, 2024, and published and made effective on October 22, 2024.

46.     The evidentiary basis for the Ordinance was compiled and delivered to Council Member Santiago-Romero by Shelly Miller, executive director of Scotsdale Women's Center and a self-described "long-time abortion rights activist." Miller provided the Council Member with a "thick red binder tracking abusive protesters." Miller argued that the Ordinance was necessary because of how pro-life sidewalk counselors "behave," stating: "If all sidewalk counselors are so calm and thoughtful and lovely to be around, why are we talking about a buffer zone? We're talking about a buffer zone because that is not how they behave."

47.     Council Member Santiago-Romero recounted a personal experience at a Detroit clinic in which a sidewalk counselor approached

her and said words to the effect of "please don't kill your baby" and "The Lord has sent me to save your baby." She described this experience as "traumatic" and "overwhelming." She characterized this paradigmatically pro-life, religiously motivated expression as the type of conduct the Ordinance was designed to address.

48.   Public testimony in support of the Ordinance specifically and exclusively targeted pro-life, religiously motivated speech. Detroit resident Emma Howland-Bolton characterized sidewalk counseling as "grown men wearing GoPros screaming at women." A volunteer clinic escort testified that sidewalk counselors "harass women who are trying to access medical care." Other supporters described "protesters screaming religiously-inspired diatribes and encroaching on the personal space of patients."

49.   Council Member Santiago-Romero specifically noted that "problematic protesters are rarely Detroit residents," referencing photographs of out-of-state license plates. This statement reveals that the Ordinance was motivated not by neutral concerns about public safety, but by the identity and viewpoint of specific speakers—out-of-state pro-

life advocates traveling to Detroit to counsel women outside abortion clinics.

50.     Detroit City Attorney Adam Saxby told the Council that "an identical ordinance in Colorado was upheld by the U.S. Supreme Court" and that the Ordinance was constitutional "without question." This analysis relied entirely on *Hill v. Colorado*, 530 U.S. 703 (2000)—a twenty-five-year-old decision that addressed only a standalone bubble zone, not a combined buffer-plus-bubble scheme. The City Attorney's analysis failed to address *McCullen v. Coakley*, 573 U.S. 464 (2014), *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), or the Third Circuit's decision in *Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009), which struck down the precise combination of a 15-foot buffer zone and an 8-foot bubble zone that Detroit enacted. The City Attorney's stated analysis also did not address less restrictive alternatives.

51.     Media coverage and legislators' own statements confirm that the Ordinance, though facially applicable to all healthcare facilities, was understood by its sponsors and supporters to target abortion clinics. As one media outlet summarized, supporters said the Ordinance was "most needed at clinics providing abortion services." The entire legislative

24

record from the sponsor's admitted motivation, to the evidentiary binder compiled by an abortion clinic director, to the public testimony targeting "anti-abortion demonstrators" and "religiously-inspired diatribes" demonstrates that the Ordinance was motivated by and directed at pro-life expression at abortion clinics.

52. The legislative record contains no evidence that the City attempted to address its asserted interests through less restrictive means before enacting the Ordinance. The City did not pursue targeted injunctions against specific individuals. It did not increase enforcement of existing harassment, assault, obstruction, or trespass statutes. It did not seek dispersal orders. It moved directly to a blanket ordinance outlawing an entire category of expressive activity on public sidewalks. *McCullen*, 573 U.S. at 494 (the government must demonstrate that it "seriously undertook to address the problem with less intrusive tools readily available to it"); *Sisters for Life, Inc. v. Louisville-Jefferson Cnty. Metro Gov't*, 56 F.4th 400, 404-05 (6th Cir. 2022) (applying same framework).

53.    Council Member Angela Whitfield-Calloway was the lone dissenting vote, expressing discomfort about "possibly interfering with free speech." Her concerns went unaddressed by the Council.

54.    The legislative record does not contain evidence of any specific incident at any Detroit healthcare facility where existing law was insufficient to address obstruction or harassment. The "thick red binder" compiled by the Scotsdale Women's Center director has not been publicly disclosed, and no objective evidence was presented to the Council demonstrating that existing criminal laws—including Michigan statutes prohibiting harassment, assault, obstruction, and trespass—had been tried and found wanting.

## D. Impact of the Ordinance on Plaintiffs' Protected Activities

55.    The combination of the 15-foot buffer zone and the 8-foot bubble zone creates a layered exclusion system that is qualitatively more burdensome than either provision standing alone. Within 15 feet of the Clinic entrance, expressive activity (including congregating, patrolling, picketing, and demonstrating) is prohibited outright. *See* Ex. A at § 31-14-4(a). From 15 to 100 feet, any approach within 8 feet for purposes of leafletting, displaying a sign, or engaging in "oral protest, education or

26

counseling" requires prior consent. *See* Ex. A at § 31-14-3. This is a standard that is practically impossible to satisfy when the individual to be addressed cannot hear the speaker over the traffic noise of West 7 Mile Road.

56. The 15-foot buffer zone around the Clinic entrance effectively prevents Mr. Hammer from accessing the sidewalk east of the entrance. When the Clinic's parking lot is full, patients park on the street to the east and approach the Clinic from that direction; patients being dropped off also approach from the east. The buffer zone blocks the only direct sidewalk path to reach these patients before they enter the Clinic. To reach east-side arrivals, Mr. Hammer must detour off the sidewalk through the grass parkway strip, making for a route that is impractical in winter when the ground is often covered in snow and ice, and that requires him to leave the public sidewalk where he has the clearest legal right to stand. Without the buffer zone, Mr. Hammer would access the sidewalk east of the entrance to reach women arriving from street parking or from being dropped off.

57. The buffer zone exempts "[a]uthorized security, personnel, employees, or agents" of the Clinic who are "engaged in assisting patients

27

and other persons to enter or exit" the facility. *See* Ex. A at § 31-14-4(b)(2). Clinic employees and escorts may therefore stand within 15 feet of the entrance, approach patients, speak to them, and walk alongside them into the Clinic—the exact conduct prohibited for sidewalk counselors like Mr. Hammer. This exemption allows the Clinic's (and City's) favored speakers to monopolize the space closest to arriving patients while excluding disfavored speakers.

58.    The 8-foot floating bubble zone prevents Mr. Hammer from closing the distance necessary to communicate audibly with women approaching the Clinic. West 7 Mile Road generates substantial traffic noise. Mr. Hammer frequently cannot tell whether women hear him at all from his current position, approximately 20 to 25 feet from the Clinic door. Without the Ordinance, Mr. Hammer would approach closer whenever he could read willingness in a woman's expression and when traffic noise impeded communication, precisely the kind of responsive, compassionate interaction that effective sidewalk counseling requires.

59.    The bubble zone requires "consent" before a speaker may approach within eight feet, but provides no definition of how consent is manifested, obtained, or withdrawn. A woman walking past on a noisy

sidewalk cannot consent to being approached if she cannot hear the speaker in the first place. The Ordinance thus creates a practical Catch-22: the speaker needs to be close enough to be heard before the listener can consent, but the speaker cannot get close enough without prior consent. This paradox effectively forecloses the quiet, personal conversation that is the essence of effective sidewalk counseling.

60.   Mr. Hammer cannot precisely measure eight feet in real time while engaged in counseling. He estimates distances using sidewalk squares (each approximately six feet wide) and by pacing but acknowledges that this method creates constant ambiguity about whether any given position violates the Ordinance. This vagueness compounds the chilling effect in that Mr. Hammer must give the Ordinance a wide berth to avoid criminal prosecution, pushing him even farther from the women he seeks to reach.

61.   The Ordinance impairs SAFL's ability to carry out its core mission of sidewalk advocacy in the Detroit metropolitan area. SAFL must divert resources to address the Ordinance's impact on its local programs, including altered training protocols to advise certified advocates about criminal liability exposure, reduced program availability

29

at Detroit-area facilities, and the need to counsel local leaders and advocates about the legal consequences of the Ordinance's restrictions. The Ordinance also chills the speech of SAFL's certified advocates and deters potential new volunteers from participating in SAFL programs at Detroit-area facilities.

62. The Ordinance remains in effect and continues to chill Plaintiffs' protected speech. Mr. Hammer intends to continue sidewalk counseling at the Scotsdale Women's Center. Each time he engages in counseling, he faces the threat of criminal prosecution as a misdemeanant for speech that is protected by the First Amendment. SAFL intends to continue operating its sidewalk advocacy programs in the Detroit metropolitan area. The Ordinance imposes an ongoing burden on both Plaintiffs' protected expression.

### E. Encounters with Clinic Staff and Police

63. Since Mr. Hammer began counseling at the Scotsdale Women's Center in or about September 2025, clinic personnel have engaged in a pattern of conduct designed to drive him from the public sidewalk. On his first day, a clinic employee identified as "Jay" placed reflector sticks in the grass parkway and claimed, falsely, that police had

30

established that all protesters must stand behind those markers and off the sidewalk. Mr. Hammer refused, asserting his right to stand on the public sidewalk. In subsequent weeks, the Clinic deployed an escort who produced an approximately five-foot pool noodle and held it out toward Mr. Hammer, claiming he was violating the 8-foot bubble zone whenever he walked past her on the sidewalk. The Clinic has often called police to the site specifically because of Mr. Hammer's counseling activities. On one occasion, upon information and belief, a clinic manager or administrator pulled a vehicle into the parking lot in a manner that nearly struck Mr. Hammer, which he describes as "reckless at the least."

64. Despite multiple police responses, no officer has ever found that Mr. Hammer violated any law. On or about October 2025, City police responded to the Clinic on two occasions in connection with Mr. Hammer's counseling activities. On the first occasion, two officers in one patrol car arrived, consulted with clinic employee Jay, and then spoke with Mr. Hammer. Mr. Hammer asserted his right to be on the public sidewalk but agreed to pace back and forth rather than to remain stationary as an effort to ease the officers' concern of any impeding of pedestrians, and the officers confirmed to clinic personnel that he was

31

within his rights. On the second occasion, five patrol cars responded, with supervisory officers. Mr. Hammer recited the Ordinance's provisions to the officers. The lead officer again confirmed to clinic personnel that Mr. Hammer was in compliance, and all officers departed. Mr. Hammer has never been cited, formally warned, or arrested. The fact that the Clinic has summoned the City's police—and that police officers responded—and may do so again, demonstrates both the ongoing chilling effect of the Ordinance and the credible threat of enforcement.

65. But for the Ordinance, Mr. Hammer would stand closer to the Clinic entrance, approach women who show willingness to engage in conversation or accept his literature, and access the sidewalk east of the entrance to reach women arriving from street parking. Mr. Hammer has observed that the Clinic appears to warn patients about his presence in advance: whereas in the first several weeks of his counseling, nearly every woman who approached the Clinic looked at him and many approached voluntarily, most women now display what he describes as "tunnel vision," walking directly into the Clinic without making eye contact. This inference is confirmed by Mr. Hammer's experience on one occasion when he arrived on a Tuesday (a day on which he does not

32

normally counsel) and nearly every woman who came by stopped and talked to him. The Ordinance, rather than any neutral law of general application, is the sole legal basis for the restrictions on his expressive activities, and the Clinic's advance coaching of patients makes the ability to reach women before they are pre-warned all the more critical.

## SUMMARY OF CHALLENGES PRESENTED

66. Plaintiffs challenge the Ordinance on the following grounds:

(a) The combination of a 15-foot fixed buffer zone and an 8-foot floating bubble zone is facially unconstitutional under the First Amendment and the Michigan Constitution's Free Speech Clause because it burdens substantially more speech than necessary to serve the City's interests. (Counts I and VII)

(b) The Ordinance fails narrow tailoring as applied to Plaintiffs' peaceful sidewalk counseling at the Scotsdale Women's Center because the City never attempted less restrictive alternatives. (Counts II and VII)

(c) The employee exemption in § 31-14-4(b)(2) destroys the Ordinance's general applicability, triggering strict scrutiny under the Free Exercise Clauses of the U.S. and Michigan

33

Constitutions, which the Ordinance cannot survive. (Counts III and VIII)

(d) The buffer zone's prohibition on "congregating" directly restricts the right of assembly in a traditional public forum. (Counts IV and VII)

(e) The terms "oral protest, education or counseling," "approaching," and "consent" fail to provide fair notice and invite arbitrary enforcement, in violation of the federal and state Due Process Clauses. (Counts V and VI)

(f) The Ordinance is viewpoint discriminatory and treats Plaintiffs and others unequally because of the content of their message and their religious beliefs, in violation of the Michigan Constitution's Equal Protection and Right of Fair Treatment Clauses. (Count VI)

(g) The Ordinance penalizes, interferes with, and discriminates against Plaintiffs' right to reproductive freedom and their right to aid or assist another in the exercise of her reproductive freedom by restricting, prohibiting, and chilling

34

them from providing counseling and assistance to pregnant women with options other than abortion. (Count IX)

## COUNT I
### VIOLATION OF THE FIRST AMENDMENT – FREE SPEECH (FACIAL CHALLENGE – COMBINED ZONES) (42 U.S.C. § 1983)

67. The allegations of paragraphs 1 through 66 are hereby incorporated and realleged as if here stated and alleged again in full.

68. The Ordinance regulates speech based on its content. The Free Speech Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits government from abridging freedom of speech on the public sidewalks and rights-of-way of Detroit—quintessential traditional public forums where the government's ability to restrict expression is at its most limited. *McCullen v. Coakley*, 573 U.S. 464, 476-77 (2014). Enforcement of the bubble zone (§ 31-14-3) requires determining whether a speaker's *purpose* is "oral protest, education or counseling." This is a determination that cannot be made without reference to the *content of the speech*. A person who approaches within eight feet of another to ask for directions, solicit a charitable donation, or make small talk faces no restriction; only a person whose speech constitutes "protest, education or counseling" is

subject to liability. Under *Reed v. Town of Gilbert*, a law that defines regulated speech by its "function or purpose" is content based on its face and presumptively unconstitutional. 576 U.S. 155, 163-64 (2015).

69.   Even assuming *arguendo* that the Ordinance is content neutral, it still fails intermediate scrutiny under *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). A content-neutral regulation of speech in a traditional public forum survives constitutional review only if it (1) serves a significant governmental interest, (2) is narrowly tailored—meaning it does not burden substantially more speech than is necessary to further the government's legitimate interests—and (3) leaves open ample alternative channels of communication. The Ordinance fails at least two of these three requirements.

70.   The combination of a fixed buffer zone and a floating bubble zone around the same facility entrances is facially unconstitutional because it burdens substantially more speech than necessary to serve the City's asserted interests. The Third Circuit squarely addressed this question in *Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009), and held that while either a 15-foot fixed buffer zone or an 8-foot floating bubble zone might survive constitutional scrutiny standing alone, the

combination cannot. The *Brown* court explained that Pittsburgh's ordinance created not a single bubble or buffer zone in isolation, but a "combination of legislatively enacted speech-restrictive zones without support, either in the record or in case law, for the factual proposition that both zones are needed to achieve the City's legitimate interests[.]" *Id.* at 279. The court said that "[e]ither one of the two zones, standing alone, would advance the interests identified by the City," and that the combination therefore burdens substantially more speech than necessary. *Id.* at 280. That reasoning is straightforward and compelling. If a 15-foot fixed buffer zone is sufficient to prevent physical obstruction of facility entrances, then a floating bubble zone extending to 100 feet from the entrance is unnecessary since it restricts speech in an area where the government's interest in preventing obstruction has no application. Conversely, if a floating bubble zone is sufficient to prevent unwanted close-proximity encounters, then a fixed buffer zone banning all expressive activity within 15 feet (including passive sign-holding, silent prayer, and quiet conversation) is unnecessary. Either restriction alone may serve the City's interest; the combination does not serve twice the interest but burdens twice the speech. Under *Ward*, the government

37

"may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." 491 U.S. at 799. The City bears the burden of proving narrow tailoring, and it cannot carry that burden here because the legislative record, as alleged above, contains no evidence demonstrating why a single zone is insufficient.

71.     The Sixth Circuit's narrow-tailoring framework in *Sisters for Life, Inc. v. Louisville-Jefferson County Metro Government* is even more demanding than *Brown*'s. In *Sisters for Life*, the court enjoined a 10-foot buffer zone because the government failed to prove it "seriously undertook to address the problem . . . with less intrusive tools readily available." 56 F.4th 400, 404 (6th Cir. 2022). Relying on and quoting *McCullen*, the Sixth Circuit emphasized that "[s]olving policy problems by regulating speech is a means of last resort, not first resort," *id.* at 404, and that "[a] painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency," *id.* at 405. If a single buffer zone fails this standard, *a fortiori* the combination of a 15-foot buffer *and* an 8-foot bubble fails it.

72.     Detroit's Ordinance is substantively identical to Pittsburgh's invalidated ordinance. It has the same 15-foot fixed buffer zone

38

prohibiting congregating, patrolling, picketing, and demonstrating within 15 feet of any healthcare facility entrance; the same 8-foot floating bubble zone prohibiting approaching another person for the purpose of oral protest, education, or counseling without consent within 100 feet of any entrance; and the same combination. As alleged above, the Ordinance layers two independent speech-restrictive mechanisms at the same facility entrances, and the City has offered no evidence demonstrating that both zones are necessary to serve its asserted interests. *Brown*'s reasoning applies with full force. The City's anticipated reliance on *Hill v. Colorado*, 530 U.S. 703 (2000), is misplaced. *Hill* addressed a standalone 8-foot floating bubble zone; it did not validate a combined buffer-plus-bubble scheme. *Brown* specifically distinguished *Hill* on this basis. Moreover, *Hill*'s content-neutrality analysis is widely recognized as irreconcilable with *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). Justice Thomas's February 2025 dissent from the denial of certiorari in *Coalition Life v. City of Carbondale*, 145 S. Ct. 537 (Mem.) (2025), called *Hill* "defunct" and "irreconcilable" with *McCullen*. Indeed, the City Attorney's advice that the Ordinance was constitutional "without question" relied entirely on *Hill* and failed to

39

address *McCullen*, *Reed*, *Sisters for Life*, or *Brown*, each of which severely undermines *Hill*.

73. The Ordinance contains no severability clause. The absence of a severability provision means that the unconstitutional combination cannot be judicially rewritten to retain one zone while excising the other, the entire Ordinance must fall. The City bears the burden of demonstrating that the Council would have enacted either zone independently, and the legislative history demonstrates that the Council viewed the combination as an integrated scheme.

74. The Ordinance, on its face, violates the Free Speech Clause of the First Amendment to the United States Constitution, as applied to the City of Detroit through the Fourteenth Amendment, and is unconstitutional and void. The City's enactment and threatened enforcement of the Ordinance constitute action under color of state law that deprives Plaintiffs of their clearly established constitutional rights in violation of 42 U.S.C. § 1983.

## COUNT II
## VIOLATION OF THE FIRST AMENDMENT – FREE SPEECH
## (AS-APPLIED – NARROW TAILORING)
## (42 U.S.C. § 1983)

75. The allegations of paragraphs 1 through 74 are hereby incorporated and realleged as if here stated and alleged again in full.

76. Even if the Court declines to follow *Brown*'s facial analysis, the Ordinance fails narrow tailoring as applied to Plaintiffs' peaceful sidewalk counseling at the Scotsdale Women's Center. Under *McCullen v. Coakley*, 573 U.S. 464 (2014), and *Sisters for Life, Inc. v. Louisville-Jefferson County Metro Government*, 56 F.4th 400 (6th Cir. 2022), the government must demonstrate that it seriously undertook to address the problem with less intrusive tools readily available and that those alternatives failed. "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495.

77. The City did not attempt less restrictive alternatives before enacting the Ordinance. The City did not attempt targeted enforcement of existing harassment, assault, obstruction, or trespass statutes; it did

not seek injunctions against any specific individuals who had engaged in documented misconduct; it did not use dispersal orders. The City moved directly to a blanket criminal ordinance affecting all speakers at all healthcare facilities citywide. The legislative record contains no evidence that existing laws were tried and found wanting.

78.    The Ordinance's burden is particularly severe at the Scotsdale Women's Center because of three site-specific factors alleged in the preceding factual paragraphs. First, the clinic entrance is approximately two feet from the public sidewalk, meaning the 15-foot buffer zone consumes nearly all usable sidewalk space in front of the clinic. Second, West 7 Mile Road is a major four-lane arterial road with heavy vehicle and bus traffic, generating substantial ambient noise that makes normal-volume communication at eight or more feet difficult or impossible. Third, the buffer zone effectively eliminates Mr. Hammer's access to the east-side sidewalk, blocking his only direct path to patients arriving from street parking when the clinic lot is full.

79.    The Ordinance does not leave open ample alternative channels of communication. As alleged above, the combination of the buffer zone and the bubble zone effectively eliminates Mr. Hammer's

42

ability to engage in the quiet, personal, one-on-one conversations that are the heart of effective sidewalk counseling. Shouting from a distance is not an adequate substitute. *See McCullen*, 573 U.S. at 487-89.

80.     The City's reliance on *Hill v. Colorado* does not save the Ordinance as applied. The City Attorney's advice relied entirely on *Hill*, a 25-year-old decision addressing a standalone bubble zone that has been repeatedly criticized by various members of the U.S. Supreme Court. It further failed to account for *McCullen*, *Reed*, *Sisters for Life*, and *Brown*. *Hill* did not address the site-specific burdens present at the Scotsdale Women's Center, including the proximity of the entrance to the sidewalk, the ambient traffic noise that makes communication at distance futile, and the elimination of east-side access that effectively prevents Mr. Hammer from reaching a significant portion of arriving patients.

81.     The Ordinance, as applied to Plaintiffs' peaceful sidewalk counseling at the Scotsdale Women's Center, violates the Free Speech Clause of the First Amendment to the United States Constitution, as applied to the City of Detroit through the Fourteenth Amendment. The City's enactment and threatened enforcement of the Ordinance

constitute action under color of state law that deprives Plaintiffs of their clearly established constitutional rights in violation of 42 U.S.C. § 1983.

**COUNT III**
**VIOLATION OF THE FIRST**
**AMENDMENT – FREE EXERCISE OF RELIGION**
**(42 U.S.C. § 1983)**

82.    The allegations of paragraphs 1 through 81 are hereby incorporated and realleged as if here stated and alleged again in full.

83.    The Free Exercise Clause of the First Amendment, as applied to the states by the Fourteenth Amendment, prohibits the government from imposing substantial burdens on the exercise of sincerely held religious beliefs unless the burden is imposed by a neutral law of general applicability. *See Employment Division v. Smith*, 494 U.S. 872, 879 (1990). Plaintiffs' sidewalk counseling is motivated by sincere religious beliefs and constitutes the exercise of religion within the meaning of the Free Exercise Clause. SAFL's stated mission is "to be the hands and feet of Christ," offering "loving, life-affirming alternatives to all present at abortion and abortion-referral facilities." Mr. Hammer is motivated by his sincere religious conviction that every human life has inherent dignity and that women deserve to know about the alternatives and support available to them.

84.     The Ordinance is not generally applicable because § 31-14-4(b)(2) exempts "[a]uthorized security, personnel, employees, or agents" of healthcare facilities who are "engaged in assisting patients and other persons to enter or exit" the facility. This exemption permits clinic employees and escorts to engage in the precise conduct the Ordinance forbids for everyone else: standing within 15 feet of the entrance, approaching patients, speaking to them, and walking alongside them within the buffer zone. Under the framework of *Tandon v. Newsom*, 593 U.S. 61 (2021), and *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), whenever the government treats comparable secular activity more favorably than religious exercise, the law is not generally applicable and strict scrutiny applies automatically. One exemption suffices to create constitutional infirmity.

85.     Clinic escorts engage in conduct that poses the same "risks" the City asserted as its justification for restricting sidewalk counselors. They stand near entrances, approach patients, speak to them, and walk alongside them within the buffer zone. Under *Tandon*, comparability is judged by the risks the activities pose to the government's asserted interests, not by the reasons people engage in them. 593 U.S. at 63. The

employee exemption also undermines the City's asserted interest in patient access because, if approaching patients within 15 feet of a facility entrance were inherently dangerous (which it is not), the City would not exempt clinic employees from the prohibition. The exemption thus proves that the restriction is directed not at the *conduct* of approaching patients but at the *viewpoint* of the speaker.

86. Plaintiffs' sidewalk counseling simultaneously implicates the Free Exercise Clause and the Free Speech Clause. This hybrid-rights posture independently justifies heightened scrutiny. *Employment Div. v. Smith*, 494 U.S. at 881-82 (recognizing hybrid-rights exception where a free exercise claim is coupled with other constitutional protections).

87. The Ordinance cannot survive strict scrutiny. First, the employee exemption undermines the City's asserted compelling interest by allowing the same conduct for favored actors—a fatal flaw under *Fulton*. Second, the Ordinance is not the least restrictive means of achieving the City's interest. The City never attempted targeted enforcement of existing harassment or obstruction statutes, injunctions against specific bad actors, or dispersal orders—all less restrictive

alternatives that were readily available and that the City made no effort to pursue.

88. The Ordinance violates the Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the City of Detroit through the Fourteenth Amendment. The City's enactment and threatened enforcement of the Ordinance constitute action under color of state law that deprives Plaintiffs of their clearly established constitutional rights in violation of 42 U.S.C. § 1983.

## COUNT IV
## VIOLATION OF THE FIRST
## AMENDMENT – FREEDOM OF ASSEMBLY
## (42 U.S.C. § 1983)

89. The allegations of paragraphs 1 through 88 are hereby incorporated and realleged as if here stated and alleged again in full.

90. The First Amendment protects the right of the people peaceably to assemble. The buffer zone's prohibition on "congregating" within 15 feet of any healthcare facility entrance directly restricts the right of assembly in a traditional public forum. As alleged above, Plaintiffs' collective prayer and counseling activities (including Mr. Hammer's coordination with Tom Pfaffenbach, the prayer group from

Reconciled Church, and SAFL volunteer teams) constitute peaceable assembly protected by the First Amendment.

91. The City cannot demonstrate that prohibiting all "congregat[ing]" within 15 feet of a healthcare facility entrance is necessary to serve its interests when existing obstruction laws already prohibit physical blocking of entrances. The assembly prohibition is broader than necessary and sweeps in core protected activity—group prayer, silent vigils, and coordinated sidewalk outreach—that poses no threat to patient access.

92. The Ordinance violates the Freedom of Assembly Clause of the First Amendment to the United States Constitution, as applied to the City of Detroit through the Fourteenth Amendment. The City's enactment and threatened enforcement of the Ordinance constitute action under color of state law that deprives Plaintiffs of their clearly established constitutional rights in violation of 42 U.S.C. § 1983.

## COUNT V
## VIOLATION OF THE FOURTEENTH
## AMENDMENT – VOID FOR VAGUENESS
## (42 U.S.C. § 1983)

93. The allegations of paragraphs 1 through 92 are hereby incorporated and realleged as if here stated and alleged again in full.

94. The Due Process Clause of the Fourteenth Amendment requires that a criminal statute or ordinance provide sufficient clarity to persons of ordinary intelligence as to what conduct is prohibited, and adequate standards to prevent arbitrary and discriminatory enforcement. Because the Ordinance regulates speech protected by the First Amendment, it is subject to a more stringent vagueness test.

95. The Ordinance fails this standard as to multiple operative terms. *First*, "oral protest, education or counseling." The Ordinance does not define when a greeting becomes "counseling," when offering directions becomes "education," or when a statement of opinion becomes "protest." *Second*, "knowingly approach." The Ordinance does not specify whether standing still while another person walks toward the speaker constitutes "approach[ing]," or whether pacing on a public sidewalk does. *Third*, "consent." The Ordinance provides no definition of how consent is manifested, obtained, or withdrawn—whether it may be given by eye contact, a nod, or a verbal statement, or whether it must be affirmative and express. Mr. Hammer cannot determine in real time whether any given position or interaction violates the Ordinance, and the resulting ambiguity forces him to give the law a wide berth, thus chilling

49

substantially more speech than the City can constitutionally restrict. The Ordinance creates a practical Catch-22 since a speaker needs to be close enough to be heard before a listener can consent to the approach, but the speaker cannot get close enough without prior consent.

96. The Ordinance is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, both on its face and as applied to Plaintiffs. The City's enactment and threatened enforcement of the Ordinance constitute action under color of state law that deprives Plaintiffs of their clearly established constitutional rights in violation of 42 U.S.C. § 1983.

## COUNT VI
## VIOLATION OF THE MICHIGAN CONSTITUTION – EQUAL PROTECTION, DUE PROCESS, AND RIGHT OF FAIR TREATMENT (MICHIGAN CONSTITUTION, ART. I, SECTIONS 2 & 17)

97. The allegations of paragraphs 1 through 96 are hereby incorporated and realleged as if here stated and alleged again in full.

98. Article I, Section 2, of the Michigan Constitution provides that "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be

50

discriminated against in the exercise thereof because of religion, race, color or national origin."

99. Article I, Section 17, of the Michigan Constitution provides that no one may be "be deprived of life, liberty or property, without due process of law."

100. Article I, Section 17, also provides that "[t]he right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed."

101. The Ordinance violates the Michigan Constitution's guarantee of due process because it is void for vagueness and fails to provide Plaintiffs and others constitutionally adequate notice of what constitutes a violation of the law.

102. The Ordinance violates the Michigan Constitution's guarantees of equal protection and of fair and just treatment by targeting for curtailment and suppression Plaintiffs' exercise of their civil liberties because of their viewpoint, message, and purpose.

103. The Ordinance denies Plaintiffs' the enjoyment of their civil and political rights and discriminates against them because of their

51

religion and religious belief and practices in violation of Article I, Sections 2 & 17.

104. As a proximate result of the City's violation of Article I, Sections 2 & 17, Plaintiffs have been, and continue to be, denied fair and just treatment, and their civil and political rights have been, and continue to be, unconstitutionally abridged, restricted, and chilled, thereby entitling them to relief, including declaratory and injunctive relief.

**COUNT VII**
**VIOLATION OF THE MICHIGAN CONSTITUTION – FREE SPEECH AND FREEDOM OF PETITION**
**(MICHIGAN CONSTITUTION, ART. I, SECTIONS 3 & 5)**

105. The allegations of paragraphs 1 through 104 are hereby incorporated and realleged as if here stated and alleged again in full.

106. Article I, Section 3, of the Michigan Constitution provides that "[t]he people have the right peaceably to assemble, to consult for the common good, to instruct their representatives and to petition the government for redress of grievances."

107. Article I, Section 5, of the Michigan Constitution provides that "[e]very person may freely speak, write, express and publish his views on

52

all subjects . . . and no law shall be enacted to restrain or abridge the liberty of speech or of the press."

108. Through imposition of buffer and bubble zones that restrict congregating in public and engaging in free speech and leafleting in public forums, the City's Ordinance unconstitutionally restrains, abridges, and chills Plaintiffs' rights to peaceably assemble and consult for the common good, to exercise their liberty of speech and of the press, and to speak, write, express, and publish their views on matters of public importance.

109. As a proximate result of the City's violation of Article I, Sections 3 & 5, Plaintiffs' rights under Article I, Sections 3 & 5, have been, and continue to be, unconstitutionally abridged, restricted, and chilled, thereby entitling them to relief, including declaratory and injunctive relief.

## COUNT VIII
## VIOLATION OF THE MICHIGAN
## CONSTITUTION – FREE EXERCISE OF RELIGION
## (MICHIGAN CONSTITUTION, ART. I, SECTION 4)

110. The allegations of paragraphs 1 through 109 are hereby incorporated and realleged as if here stated and alleged again in full.

111.  Article I, Section 4, of the Michigan Constitution provides that "[e]very person shall be at liberty to worship God according to the dictates of his own conscience" and that "[t]he civil and political rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious belief."

112. The Ordinance substantially interferes with and burdens Plaintiffs' sidewalk counseling ministry, which is motivated by sincere religious beliefs and constitutes the exercise of religion within the meaning of the Article I, Section 4.

113. The Ordinance targets Plaintiffs and those like them who seek to exercise their faith and spread their faith-based message in public, while privileging similar secular activities.

114. As a proximate result of the City's violation of Article I, Section 4, Plaintiffs' rights under Article I, Section 4, have been, and continue to be, unconstitutionally abridged, restricted, and chilled, thereby entitling them to relief, including declaratory and injunctive relief.

## COUNT IX
## VIOLATION OF THE MICHIGAN
## CONSTITUTION – REPRODUCTIVE RIGHTS
## (MICHIGAN CONSTITUTION, ART. I, SECTION 28)

115. The allegations of paragraphs 1 through 114 are hereby incorporated and realleged as if here stated and alleged again in full.

116. Article I, Section 28, of the Michigan Constitution provides, *inter alia*, that "[e]very individual has a fundamental right to reproductive freedom, which entails the right to make and effectuate decisions about all matters relating to pregnancy, including but not limited to prenatal care, childbirth, postpartum care, contraception, sterilization, abortion care, miscarriage management, and infertility care."

117. Any interference with the rights guaranteed by Article I, Section 28, must satisfy strict scrutiny and be "justified by a compelling state interest achieved by the least restrictive means."

118. Article I, Section 28, further prohibits "discriminat[ion] in the protection or enforcement" of the rights it guarantees.

119. Additionally, Article I, Section 28, provides that the government may not "penalize, prosecute, or otherwise take adverse action against someone for aiding or assisting a pregnant individual in

exercising their right to reproductive freedom with their voluntary consent."

120. Through their sidewalk advocacy, Plaintiffs provide information to women about prenatal care, childbirth, postpartum care, abortion care, miscarriage management, and other information about reproductive health care, including means and resources by which a pregnant woman will be supported if she chooses life over abortion.

121. Both by restricting and prohibiting Plaintiffs' ability to provide aid and assistance to pregnant women in exercising their right to reproductive freedom with their voluntary consent and targeting Plaintiffs for their prior aid and assistance to pregnant women in their exercise of reproductive freedom, the Ordinance penalizes, prosecutes, and otherwise takes adverse action against Plaintiffs for aiding or assisting, and seeking to aid and assist, women with their consent and discriminates in the enforcement and protection of reproductive health options in favor of abortion and against options other than abortion.

122. The Ordinance's restrictions and discrimination fail strict scrutiny.

123. As a proximate result of the City's violation of Article I, Section 28, Plaintiffs' rights under Article I, Section 28, have been, and continue to be, unconstitutionally abridged, restricted, and chilled, thereby entitling them to relief, including declaratory and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1. Issue a **declaratory judgment** pursuant to 28 U.S.C. §§ 2201–2202, Federal Rule of Civil Procedure 57, and/or MCR 2.605, declaring that Ordinance No. 2024-45, Detroit City Code Chapter 31, Article XIV, §§ 31-14-1 through 31-14-4, is unconstitutional on its face and as applied to Plaintiffs, in violation of the Free Speech, Free Exercise, Freedom of Assembly, and Due Process Clauses of the United States Constitution as well as in violation of the Michigan Constitution;

2. Issue a **temporary restraining order and/or preliminary injunction**, followed by a **permanent injunction**, restraining and enjoining the Defendant City of Detroit, its officers, agents, employees, attorneys, and successors in office, and all other

57

persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with, the Ordinance in its entirety and/or each of its unconstitutional provisions, on their face and as applied to Plaintiffs;

3. Award Plaintiffs **nominal damages** in the amount of One Dollar ($1.00);

4. Award Plaintiffs their **reasonable attorneys' fees and costs** pursuant to 42 U.S.C. § 1988 and as otherwise allowed by law;

5. Award Plaintiffs their **costs of suit** pursuant to 28 U.S.C. § 1920 and as otherwise allowed by law; and

6. Grant such **other and further relief** as the Court deems just and proper.

[*Signature appears on following page.*]

Respectfully submitted, this the <u>18th</u> day of March, 2026.

THOMAS MORE SOCIETY

By: <u>s/B. Tyler Brooks</u>
B. Tyler Brooks (P82567)
309 W. Washington Street
Suite 1250
Chicago, Illinois 60606
(312) 782-1680
Fax: (336) 900-6535
tbrooks@thomasmoresociety.org

*Counsel for Plaintiffs*

59